## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

IN RE:        SHAWNNAT N. FERGUSON        :        Chapter 13
                                                                         :
                     Debtor        :        Bky. No. 07-14559ELF

# O P I N I O N

## I.  INTRODUCTION

The contested matter before me requires that I interpret and apply 11 U.S.C. §362(c)(4), a

provision added to the automatic stay provision of the Bankruptcy Code in  2005 by the

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").[1]

Under §362(c)(4), if two (2) or more cases of the debtor "were pending within the

previous year but were dismissed," the automatic stay under §362(a) does not arise upon the

filing of the case.  Id. §362(c)(4)(A).[2]  If the automatic stay does not arise due to the operation of

§362(c)(4)(A), the debtor may request that the court enter an order imposing a stay against the

creditors.  If the request is granted, the order imposes a stay that is the equivalent of the

"automatic stay" under 11 U.S.C. §362(a).  See 11 U.S.C. §362(c)(4)(B) (providing that the court

---

[1]        Pub. L. No. 109-8, 119 Stat. 23 (2005).   In most bankruptcy cases, upon the
filing of a bankruptcy petition, an "automatic stay" arises.    The automatic stay restrains most
types of collection action by creditors.  See 11 U.S.C. §362(a), (b).  Since October 17, 2005, the
effective date of BAPCPA, "the stay" provided by §362(a) may remain in effect for only a
limited time period or may not go into effect at all in certain circumstances.  See 11 U.S.C.
§362(c)(3), (c)(4), (l), (n).

[2]        Although the wording of the statute is not crystal clear, it appears that, by its
terms, 11 U.S.C. §362(c)(4)(A) does not apply if the most previously dismissed case was
dismissed pursuant to 11 U.S.C. §707(b).  Section 362(c)(4)(A) provides:

may order into effect "the stay" that did not go into effect upon the filing of the case due to  the

operation of §362(c)(4)(A)(i).[3]

---

[3]      Section 362(c)(4), in its entirety, provides:

(A)      (i) if a single or joint case is filed by or against a debtor who is an individual under this
title, and if 2 or more single or joint cases of the debtor were pending within the previous
year but were dismissed, other than a case refiled under section 707(b), the stay under
subsection (a) shall not go into effect upon the filing of the later case; and

(ii) on request of a party in interest, the court shall promptly enter an order confirming
that no stay is in effect;

(B) if, within 30 days after the filing of the later case, a party in interest requests the court may
order the stay to take effect in the case as to any or all creditors (subject to such conditions or
limitations as the court may impose), after notice and a hearing, only if the party in interest
demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;

(C) a stay imposed under subparagraph (B) shall be effective on the date of the entry of the order
allowing the stay to go into effect; and

(D) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such
presumption may be rebutted by clear and convincing evidence to the contrary)--

(i) as to all creditors if--

(i) 2 or more previous cases under this title in which the individual was a debtor
were pending within the 1-year period;

(II) a previous case under this title in which the individual was a debtor was
dismissed within the time period stated in this paragraph after the debtor failed
to file or amend the petition or other documents as required by this title or the
court without substantial excuse (but mere inadvertence or negligence shall not
be substantial excuse unless the dismissal was caused by the negligence of the
debtor's attorney), failed to provide adequate protection as ordered by the court,
or failed to perform the terms of a plan confirmed by the court; or

(III) there has not been a substantial change in the financial or personal affairs of
the debtor since the dismissal of the next most previous case under this title, or
any other reason to conclude that the later case will not be concluded, if a case
under chapter 7, with a discharge, and if a case under chapter 11 or 13, with a
confirmed plan that will be fully performed; or

(ii) as to any creditor that commenced an action under subsection (d) in a previous case
in which the individual was a debtor if, as of the date of dismissal of such case, such

On August 6, 2007, the Debtor filed the above-captioned bankruptcy case ("the Present Case").  The Present Case is the Debtor's third bankruptcy filing.  Both of the Debtor's earlier cases were dismissed less than one year before the Present Case was filed.

On August 20, 2007, the Debtor filed a motion ("the Motion") in the Present Case requesting that the court grant her relief under 11 U.S.C. §362(c)(4)(B) by imposing a "stay." (Present Case Docket Entry No. 11).  More specifically, the Debtor seeks an order staying Washington Mutual Bank ("WMB") from proceeding further in a state court foreclosure proceeding that is pending against the Debtor's residential real property.  If the stay is imposed, the Debtor will attempt to cure a prepetition mortgage delinquency through a chapter 13 plan in which she proposes to pay directly to WMB the post-petition monthly installments falling due on the WMB mortgage and to cure the prepetition mortgage delinquency through the chapter 13 plan payments paid to the Chapter 13 Trustee ("the Trustee").

An evidentiary hearing on the Motion, scheduled on an expedited basis, was held on September 11, 2007.  Counsel for WMB appeared at the expedited hearing in opposition to the Motion.  At the conclusion of the hearing, I took the matter under advisement.

For the reasons set forth below, I conclude that this bankruptcy case was filed in good faith as to WMB.  Therefore, I will grant the Motion and enter an order staying WMB from foreclosing against the Debtor's residence.

---

action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to such action of such creditor.

## II.  FINDINGS OF FACT

Based on the evidence presented at the hearing on September 11, 2007 and other

undisputed facts,[4] I make the following findings of fact:

1.     The Debtor is an individual who owns and resides at 655 E. Tioga Street, Philadelphia,

PA 19134 ("the Property").

2.     The Property is encumbered by a mortgage held by WMB.

3.     Presently, the Debtor has minimal equity in the Property.

### The First Case

4.     The Debtor first sought bankruptcy relief by filing a chapter 13 case on June 6, 2005,

docketed as Bky. No. 05-17896 ("the First Case").

5.     The filing of the First Case stayed execution of a default judgment in mortgage

foreclosure entered on March 4, 2005 in favor of WMB in the Court of Common Pleas,

Philadelphia County.  See Washington Mutual Bank v. Ferguson, No. 2180, January

Term 2005 (C.P. Phila.).

6.     In the First Case, WMB filed a proof of claim asserting a secured claim of $51,009.62

and prepetition arrearages of $9,013.84.  See Exhibits W-7 and W-8.

---

[4]        I may take judicial notice of the dockets and the content of the documents filed in
the case for the purpose of ascertaining the timing and status of events in the case and facts not
reasonably in dispute.  See Fed. R. Evid. 201;  In re Scholl, 1998 WL 546607, at *1 n.1 (Bankr.
E.D. Pa. Aug. 26, 1998);  See also In re Indian Palm Assocs., Ltd., 61 F.3d 197, 205 (3d Cir.
1995). I may also take judicial notice of matters of record in the state courts within this
jurisdiction.  E.g., In re Soto, 221 B.R. 343, 347 (Bankr. E.D. Pa. 1998).

7.	The Debtor's initially-filed chapter 13 plan provided that the Debtor pay the Trustee

	$375.60 per month for sixty (60) months.  <u>See</u> First Case Docket Entry No. 12.

8.	On March 20, 2006, the Debtor filed her First Amended Chapter 13 Plan.  <u>See</u> First Case

	Docket Entry No. 44.

9.	The Debtor's First Amended Chapter 13 Plan ("the Confirmed Plan") was confirmed by

	Order of this court dated April 18, 2006.  <u>See</u> Exhibit W-3; First Case Docket Entry No.

	54.

10.	Under the Confirmed Plan, the Debtor:

- was obliged to pay the post-petition installments falling due on the WMB mortgage;[5]

- proposed to pay the Trustee $3,008.15 paid over the initial nine (9) months of the plan, followed by fifty-one (51) monthly payments of $460.18 per month for final fifty-one (51) months; and

- proposed, <u>inter alia</u>, that the Trustee distribute $9,013.84 on account of WMB's claim for prepetition mortgage arrearages and $14,256.79 to HSBC Auto Finance ("HSBC") in full satisfaction of HSBC's secured claim.[6]

11.	On June 5, 2006, WMB filed a motion for relief from the automatic stay under 11 U.S.C.

	§362(d), alleging that the Debtor had failed to pay the monthly installments falling due in

---

[5]	According to the Debtor's Schedule J, the monthly installment was $430.00 per month.  (First Case Docket Entry No. 11).

[6]	These terms are precisely the same as those in the Debtor's initial chapter 13 plan in the Present Case.  (<u>See</u> Present Case Docket Entry No. 13).  I infer that the Debtor and her counsel made no effort to estimate what the updated balances were on the two (2) secured claims when preparing the plan in the Present Case.  While this is somewhat troubling, I attribute what might be characterized as a lack of professional diligence to the Debtor's counsel, not to the Debtor.  By itself, the shortcoming is not determinative on the issue of "good faith" under §362(c)(4), discussed in Part IV, <u>infra</u>, at least where, as here, prompt amendments to the Debtor's schedules and plan were filed early in the case.

the period April to June 2006 ("the WMB §362 Motion").  See Exhibit W-4; First Case

Docket Entry No. 56.

12.    The WMB §362 Motion was settled by a Stipulation, approved by the court on August 1,

2006, in which the Debtor agreed to resume payment of monthly installments and cure

the post-petition delinquency by paying an additional $295.51 per month from August

2006 through January 2007.  See Exhibit W-5; First Case Docket Entry No. 65.

13.    After the court's approval of the Stipulation settling the WMB §362 motion, the Debtor

performed her obligations under the Stipulation and continued to pay her postpetition

monthly installments to WMB through April 2007.[7]

14.     During the first nine (9) months of the First Case, the Debtor substantially performed her

plan payment obligations to the Trustee under the terms of her initially filed chapter 13

plan.[8]

15.    The Debtor fared less well in her performance of her plan obligations to the Trustee after

March 2006.  In the thirteen (13) months between April 2006 through April 2007, the

Debtor made eleven (11) payments, constituting $4,400.00 of the $5,982.34 in payments

---

[7]    I infer this fact from the absence of any further docket activity involving WMB.
Had the Debtor missed any payments, I expect that WMB would have filed a Certificate of
Default pursuant to the terms of the parties' Stipulation that settled the motion for relief from the
automatic stay.  At the hearing on the Motion in the Present Case, WMB's counsel made the
same inference.

[8]    Between July 2005 and March 2006, nine (9) monthly payments of $375.60 fell
due under the terms of the Debtor's initial chapter 13 plan.  The Trustee's case report, Exhibit
W-6, reflects that the Debtor made eight (8) of the nine (9) payments.

that fell due to the Trustee under the Confirmed Plan.  See Exhibit W-6.[9]

16.     The Debtor suffered an interruption in her income in the period between December 2006

        and February 2007.  She was out of work during that time frame due to health problems.[10]

17.     Although the Debtor was entitled to receive disability benefits, she did not receive any

        disability checks until after she returned to work.[11]

18.     On motion of the Trustee, the First Case was dismissed by Order dated April 24, 2007.

19.     As of the dismissal date, the Debtor had paid the Trustee $7,908.00 of the $8,990.49 that

        had fallen due under the Confirmed Plan.

20.     Prior to the dismissal of the First Case, the Trustee distributed $2,207.38 to WMB,

        reducing the prepetition arrearage on the mortgage from $9,013.84 to $6,806.46.


**The Second Case**

21.     On July 9, 2007, the Debtor commenced another chapter 13 case by filing a bankruptcy

        petition that was docketed as Bky. No. 07-13924 ("the Second Case").

22.     The Debtor was represented by the same attorney in the Second Case as in the First Case.

23.     Prior to filing the Second Case, the Debtor did not receive a briefing from an approved

        nonprofit budget and credit counseling agency as required by 11 U.S.C. §109(h)(1).

---

        [9]     Shortly after the First Case was dismissed, the Debtor also paid the Trustee an
additional $460.00, which was credited by the Trustee.

        [10]    The Debtor suffers from diabetes.

        [11]    Thus, it is not clear how the Debtor managed to pay her monthly mortgage
payment to WMB and make payments to the Trustee (albeit less than that required by the
Confirmed Plan) in January and February 2007.

24.     The Debtor's failure to obtain prepetition credit counseling before filing the Second Case

was caused by her attorney's failure to properly advise her to do so.

25.     By Order dated July 26, 2007, the court dismissed the Second Case due to the Debtor's

failure to comply with 11 U.S.C. §109(h)(1).  See Second Case Docket Entry No. 14.


## The Present Case

26.     On August 6, 2007, the Debtor commenced the Present Case by filing a petition under

chapter 13 of the Bankruptcy Code.

27.     In her Schedule A, the Debtor estimated the fair market value of the Property to be

$56,000.  See Present Case Docket Entry No. 16.

28.     WMB has filed a secured proof of claim in the total amount of $52,415.34, with a

prepetition arrearage of $11,158.00.

29.     The prepetition arrearage claimed by WMB includes approximately $1,000 to $1,500 in

sheriff's sale costs that will be refunded if the sale were stayed prior to approximately

October 22, 2007.  Thus, if a stay is imposed, after the sheriff's refund is determined,

WMB can be expected to amend its filed proof of claim for prepetition arrearages and

reduce the arrearages claim to an amount in the range of $9,658 to $10,158.[12]

---

[12]        Without making any binding decision on the issue, it is likely that WMB's claim
for prepetition arrearages is allowable in the range quoted in the text. The low and high points of
the range represent roughly $2,800.00 to $3,300.00 more than the prepetition arrearage remaining
after the last distribution by the Trustee in the First Case. It is likely that the Debtor did not pay at
least four (4) monthly payments of approximately $430 per month after the dismissal of the First
Case and WMB may have incurred some legal expenses since the dismissal of the bankruptcy
case that may be reimbursable to WMB under the terms of the mortgage.  Thus, if the range of
$9,658 to $10,158 is not accurate, it should be close to the mark.

30.  The Debtor's primary purpose in filing the Present Case was to implement a chapter 13 plan

pursuant to which she proposes to:

- pay directly to WMB the post-petition monthly installments falling due on the
  WMB mortgage; and

- cure the prepetition mortgage delinquency through the chapter 13 plan
  payments she makes to the Trustee.

31.  The post-petition installments falling due on the WMB mortgage are in the amount of

$430.00 per month.  The monthly payment does not include an escrow component for

hazard insurance on the Property.[13]

32.  As of the September 11, 2007 hearing date on the Motion, the Debtor's chapter 13 plan

proposed to pay the Trustee $391.05 per month for sixty (60) months.  The chapter 13 plan

proposed, inter alia, that the Trustee distribute $9,013.84 on account of WMB's claim for

prepetition mortgage arrearages and $14,256.79 to HSBC in full satisfaction of HSBC's

claim, which is secured by the Debtor's automobile (2002 Nissan Altima). (See Present

Case Docket Entry No. 19).

33.  On the date of the hearing, the Debtor filed a second amended chapter 13 plan, which

increased the Debtor's monthly plan payment to $510.57 and increased the proposed trustee

distribution to WMB of $10,013.84.  See Present Case Docket Entry No. 24.

34.  In her Amended Schedule I, the Debtor disclosed that her average net monthly income is

$2,630.18, derived from:

---

[13]    The Debtor proposes to purchase property insurance herself at an estimated
expense of almost $300 per year.  See Amended Schedule J (Present Case Docket Entry No. 23).

- her employment as a dispatcher with Allied Barton Security Services ("Allied Barton"), which provides the Debtor net monthly income of $2,251.18; and

- part-time work at a second job[14] that provides the Debtor net monthly income of $379.00.[15]

35. The Debtor has been employed by Allied Barton for five (5) years prior to filing the Present Case.

36. The Debtor's part-time employer is ICT Group, Inc. ("ICT").

37. The Debtor's first paycheck from ICT, her part-time employer was for the week ending August 17, 2007, which is eleven (11) days after the filing of this bankruptcy case.  See Exhibit D-2

38. The Debtor's Amended I disclosure of $2,630 in net monthly income is a reasonable projection of the Debtor's income.[16]

---

[14]      In Amended Schedule I, the additional income is listed in the column provided by the form for disclosure of a spouse's income.  See Present Case Docket Entry No. 22.  The Debtor is not married.  At the hearing, the Debtor clarified that the income disclosed in the "spouse's income" column was actually the income from her second job.

[15]      In a separate filing on Form B22C, the Debtor disclosed that her "current monthly income" was less than the applicable median family income of her applicable state. "Current monthly income" is a term of art in personal bankruptcy cases and is calculated differently than the monthly income disclosed on Schedule I.   See generally 11 U.S.C. §101(10A) (defining "current monthly income"); id. §1325(b)(3) (setting forth consequences of relationship of current monthly income to median family income for purposes of chapter 13 confirmation requirements).

[16]      After reviewing the Debtor's prepetition payroll statements from Allied Barton, see Exhibits D-4 through D-7, it appears that the Debtor may have been averaging slightly more net pay from Allied Barton in the quarter preceding the filing of this case than she projected in Amended Schedule I.  I note, however, that several of the prepetition pay periods included payment for a considerable number of hours for overtime work.  It is doubtful that the Debtor can continue to work overtime on a regular basis, while also working at a second part-time job for the duration of a five (5) year chapter 13 plan.  Indeed, at the hearing, the Debtor acknowledged on cross-examination that she had not worked any overtime at Allied Barton in her most recent pay periods.

39.    In her Amended Schedule J, the Debtor disclosed that her average monthly expenses are

$2,060.00.  See Exhibit D-8.

40.    The projection of $2,060 per month in net income is a reasonable projection of the Debtor's

monthly expenses.[17]

---

As for ICT, in the two (2) weekly pay periods immediately after the filing of this bankruptcy case, the Debtor worked more than forty-seven (47) hours for ICT and earned $384.17 in net pay.  Since there are two (2) months each year in which an individual who is paid weekly would receive five (5) paychecks rather than four (4), it is customary in bankruptcy practice to calculate monthly income from a weekly paycheck by multiplying the pay by "4.3," rather than by "4."  The equivalent calculation for bi-weekly pay is to multiply the amount of the paycheck by "2.15," rather than by "2."  In this case, if I treat the average of the two weekly net payment amounts that the Debtor received from ICT as a single bi-weekly pay and multiply by 2.15, the monthly amount is $825.97.  This is more than double the amount estimated by the Debtor in her Amended Schedule I.

I am not persuaded that the Debtor can regularly expect to work the number of hours of overtime on her primary job and the number of hours on her second job as reflected on the Debtor's exhibits.  It is unlikely that the Debtor's health or stamina will permit her to work at such a pace for five (5) years, even assuming that her employers would make that number of hours of work available to her.  Indeed, on cross-examination, the Debtor acknowledged that, for health reasons, she would be reducing her hours at ICT to 10 hours per week effective immediately.  And, as stated in the preceding paragraph, the number of hours she has worked overtime at Allied Barton decreased since this bankruptcy was filed.

Nevertheless, I find that the Debtor's projection of $2,630 per month in net monthly income in Schedule I to be a reasonable projection because she does not need to work herculean hours in both jobs to meet the projection.  Between occasional and modest overtime hours at Allied Barton and a projection of ten (10) hours per week at ICT, I find that the Debtor's expected net monthly income is at least $2,630.00 per month for purposes of analyzing whether the Debtor is entitled to relief under 11 U.S.C. §362(c)(4)(B).

[17]    On cross-examination, counsel for WMB probed deftly for the existence of living expenses that the Debtor may have overlooked in preparing her Amended Schedule J, but was unsuccessful in shaking the Debtor's testimony in a material fashion.  The Debtor did concede that her travel expenses will increase because of her second job.  However, there was no further questioning to quantify the amount of the increase.  Since the Debtor's budget as set forth in Schedules I and J has a modest cushion of approximately $50.00 per month after payment of the proposed monthly chapter 13 plan payment, I am satisfied that this increased cost, by itself, does not render the Debtor's rehabilitation plan infeasible.

41.    The Debtor's income and expense projections suggest that the Debtor has approximately

$570.00 available each month for funding a chapter 13 plan.

## III.  CONCLUSIONS OF LAW

1.    Because the Debtor had two (2) cases pending in the year before the commencement of the

Present Case, the automatic stay under 11 U.S.C. §362(a) did not go into effect in this

bankruptcy case upon filing of the petition in the case.  11 U.S.C. §362(c)(4)(A).

2.    The court may impose a stay on some or all of the Debtor's creditors under 11 U.S.C.

§362(c)(4)(B) if the Debtor proves that the Present Case was filed in good faith as to the

creditors to be stayed.

3.    In some cases under §362(c)(4), a rebuttable presumption arises that the most recently filed

bankruptcy case was <u>not</u> filed in good faith.  11 U.S.C. §362(c)(4)(D)(i)-(ii).[18]

4.    The party opposing the imposition of the stay bears the burden of proof on the issue

whether a presumption arises that the most recently filed case was filed not in good faith.

---

[18]       Under 11 U.S.C. §362(c)(4)(A)(i), if two or more cases were pending and
dismissed within one year, the automatic stay does not arise.  Under §362(c)(4)(D)(i)(i), if two or
more cases were pending within one year, a rebuttable presumption arises that the current was
filed "not in good faith."  In light of the almost identical language in the two subsections, the
statutory text seems to suggest that the rebuttable presumption under (D) (that the most recent
case was not filed in good faith) will arise in <u>every</u> case in which the automatic stay does not
arise under (A).  Yet, §362(c)(4)(D)(i)(i) is one of three (3) <u>disjunctive</u> grounds giving rise to the
rebuttable presumption.  This statutory overlap raises a question whether a court need ever
consider §362(c)(4)(D)(i)(II) or §362(a)(4)(D)(i)(III) or whether those  latter two (2) subsections
are surplusage.  <u>See generally</u> <u>In re Toro-Arcila</u>, 334 B.R.  224 (Bankr. S.D. Tex. 2005)
(interpreting §362(c)(4)(B) as applying to cases under §362(c)(3), in which only one previously
dismissed case preceded the presently filed bankruptcy case, in order to avoid rendering
§362(a)(4)(D)(i)(II) or §362(c)(4)(D)(i)(III) surplusage).  This case does not raise the §362(c)(3)
issue decided in <u>Toro-Arcila</u>,

In re Charles, 334 B.R. 207, 215-17 (Bankr. S.D. Tex. 2005).

5. Because the Debtor had two (2) cases pending in the year before the commencement of the
Present Case (i.e., the First Case and the Second Case), WMB has met its burden of proving
that the Present Case was presumptively filed "not in good faith."  See 11 U.S.C.
§362(c)(4)(D)(i)(i).

6. The presumption under 11 U.S.C. §362(c)(4)(D)(i)(i) that the Present Case was filed "not in
good faith" is rebuttable by clear and convincing evidence to the contrary.

7. The burden of persuasion in rebutting the presumption that the case was filed "not in good
faith" and the burden of persuasion in proving that the case was filed in good faith is on the
Debtor.  See In re Montoya, 333 B.R. 449, 456 n.13 (Bankr. D. Utah 2005) (presumption
shifts the burden of persuasion to the debtor, not merely the burden of going forward as is
provided in Fed. R. Evid. 301).

8. The "clear and convincing" standard of proof is an intermediate standard that lies between a
"preponderance of the evidence" and "beyond a reasonable doubt."  SmithKline Beecham
Corp. v. Apotex Corp., 2005 WL 941671, at *7 n.21 (E.D. Pa. Mar. 31, 2005).  Clear and
convincing evidence is evidence that produces in the mind of the trier of fact an abiding
conviction that the truth of the factual contentions is highly probable.  E.I. du Pont de
Nemours & Co. v. MacDermid, Inc., 2007 WL 2332161, *8 (D.N.J. Aug.13, 2007) (not for
publication); SmithKline Beecham Corp. v. Apotex Corp. 2005 WL 941671, at *7; see also
In re Ellis, 339 B.R. 136, 141-42 (Bankr. E.D. Pa. 2006) (describing the standard as
evidence "so clear, direct and weighty and convincing" as to enable the court to find the
facts at issue "without hesitancy").

9.   The court's determination whether a debtor has established by clear and convincing

evidence that a current bankruptcy case was filed in good faith as to the creditors to be

stayed, for purposes of 11 U.S.C. §362(c)(4)(B), is based a consideration of the totality of

the circumstances.

# IV.  <u>DISCUSSION</u>

Having set forth my findings of fact and the legal principles that guide my decision in this

case, I write further to: (1) explain in more detail how the "totality of the circumstances"

methodology is employed in determining good faith under 11 U.S.C. §362(c)(4)(B); (2) apply the

applicable legal standard to the facts in this case; and (3) address certain legal arguments raised

in opposition to the Motion by WMB.

## A.  <u>Determining "Good Faith under 11 U.S.C. §362(c)(4)(B)</u>

### 1.

In Part III above, Conclusion of Law No. 9 states that good faith under 11 U.S.C.

§362(c)(4)(B) is based on a consideration of the totality of the circumstances.  The same

question, <u>(i.e.,</u> what is the appropriate legal standard?), arises under 11 U.S.C. §362(c)(3).

Section 362(c)(3) addresses the extension of the automatic stay, which would otherwise

terminate by operation of law thirty (30) days after the filing of the case, while §362(c)(4)

involves the imposition of a stay in a case in which no stay arises.  For either the extension of the

stay or the imposition of the stay, the court must find that the current case is filed "in good faith

as to the creditors to be stayed."[19]  The appropriate methodology for determining good faith under

§362(c)(3) and §362(c)(4) has been the subject of debate in the courts and there is some division

of authority on the issue.

Some courts measure good faith by applying the same statutory standards found in

§362(c)(3)(C) and §362(c)(4)(D) and employed in those subsection to determine whether a

rebuttable presumption exists that the case has been filed "not in good faith."  E.g., In re

Whitaker, 341 B.R. 336, 345-46 (Bankr. S.D. Ga 2006).  Courts subscribing to this view require

that in a chapter 13 case, the debtor prove (usually by clear and convincing evidence) that there

has been a substantial change in the debtor's financial or personal circumstances since the

dismissal of the previous case and that the current case will likely result in the confirmation of a

chapter 13 plan that will be fully performed.[20]

Other courts disagree, reasoning that the "change in circumstances/likely to confirm

and perform a chapter 13 plan" standard found in §362(c)(3)(C)(i)(III)(bb) and

§362(c)(4)(D)(i)(III) is a legal standard that, by its own terms, defines only whether a

presumption of lack of good faith arises and that the standard is not an all-encompassing

definition of good faith under §362(c)(3) and (4).  See In re Ortiz, 355 B.R. 587, 593-94 (Bankr.

S.D Tex. 2006).  Consequently, in making a good faith determination under §362(c)(4)(B), some

courts apply the multi-factor, "totality of the circumstances" test historically used in evaluating a

---

[19]     Compare 11 U.S.C. §362(c)(3)(B) with id. §362(c)(4)(B).  The two (2) statutory
provisions are indistinguishable.  Cases construing one provision are helpful in construing the
other.  See In re Hurt, 369 B.R. 274, 278-79 (Bankr. W.D. Va. 2007).

[20]     Whether the standard of proof is "clear and convincing" or a "preponderance of
the" evidence depends on whether the rebuttable presumption has arisen that the case has been
filed "not in good faith."  See 11 U.S.C. §§362(c)(3)(C)(i)(III)(bb), 362(c)(4)(D).

debtor's good faith in chapter 13 cases.  See, e.g., In re Montoya, 333 B.R. at 457-58.

I am persuaded by the Montoya court's reasoning for its conclusion:

> the Court must draw upon prior cases interpreting the phrase "good faith" because Congress was presumptively aware of such case law when it used the term in BAPCPA. It has long been the rule that absent clear Congressional intent to the contrary, judicial interpretations of prior law are determinative when concepts, words, or statutory sections are adopted in an amended law on the same subject.

Id. at 457; accord In re Taylor, 2007 WL 1234932, at *2 (Bankr. E.D. Va. Apr. 26, 2007).

Given the historic and pervasive role that the concept of "good faith" has played in bankruptcy cases, see In re Jensen, 369 B.R. 210, 231-32 (Bankr. E.D. Pa. 2007), I find the principle of statutory construction articulated in Montoya to be of considerable weight in construing §362(c)(4)(B).  Therefore, I conclude that the proper analysis under §362(c)(4)(B) is to determine by the requisite standard of proof whether the debtor has established that the case was filed in "good faith," not simply whether "circumstances have changed" since the last case was dismissed or whether the present case will "conclude with a confirmed plan that will be fully performed."

In other words, the debtor's burden is to establish by the requisite standard of proof the ultimate fact (good faith), not every subsidiary fact that may be relevant in the good faith inquiry.  In my view, this analytic framework is more faithful to both the statutory text and the historic discretion accorded the bankruptcy courts in evaluating good faith in bankruptcy cases.  Therefore,   I join those courts that hold that the court may consider the "totality of the circumstances" in determining the debtor's good faith.  It follows that I respectfully disagree with the Whitaker court's suggestion that the good faith analysis under §362(c)(4)(B) is limited solely to consideration of the factors set forth in §362(c)(4)(D).

-16-

Further, I accept the proposition that no one factor is determinative in evaluating good faith. In re Charles, 334 B.R. at 223. This principle, too, is consistent with the accepted judicial practice of employing the "good faith" doctrine as a flexible tool to prevent the abuse of the bankruptcy statute. I do not read §362(c)(4) as expressing Congress' intent to override this historic practice. Accord Perlin v. Hitachi Capital America Corp., 497 F.3d 364, 370-71 (3d Cir. 2007) (affirming bankruptcy court decision not to dismiss case for lack of good faith and reiterating broad scope of bankruptcy court's discretion in deciding whether to dismiss chapter 7 case for "abuse," even in face of statutory provision that arguably was intended to limit the court's inquiry to specified factors enumerated in the statute); see generally Marrama v. Citizens Bank of Mass., 127 S.Ct. 1105, 1111-12 (2007) (declining to interpret text or legislative history of §706 or §1307(c) to override historic power of bankruptcy court to define and remedy a "bad faith" bankruptcy filing).

All of that said, the gap between the Whitaker and Montoya approaches may not be quite as wide as it might initially appear. The determination of good faith under §362(c)(4)(B), based on a totality of the circumstances, cannot be divorced entirely from its statutory context. Even in a totality of the circumstances inquiry, some factors may be more relevant than others and entitled to greater weight. Thus, the probability of success of a debtor's plan – a factor found in §362(c)(4)(D) – is indisputably important in evaluating good faith in §362(c)(4)(B). See In re Morales, 366 B.R. 919, 922 (Bankr. D. Neb. 2007) (suggesting that the probability of success of a debtor's plan is "the most important factor" in determining good faith); see also In re Charles, 334 B.R. at 218 (requiring debtors to establish a "reasonable" or a "meaningful" probability of success as an objective, threshold requirement to establish good faith under §362(c)(3)). And, in

evaluating the likelihood that a debtor's plan will succeed, it may also helpful, in many cases, to consider another factor found in §362(c)(4)(D): whether the circumstances that caused a prior chapter 13 rehabilitation effort to fail have changed.  As the court observed in In re Elliott-Cook, 357 B.R. 811, 815 (Bankr. N.D. Cal. 2006):

> While the factors to be considered are neither weighted nor exhaustive . . .  the types of factors to be considered make it clear that two issues are very significant for purposes of determining good faith under § 362(c)(3): 1) why the previous plan failed, and 2) what has changed so that the present plan is likely to succeed.

Having chosen to follow the totality of the circumstances test for determining good faith under 11 U.S.C. §362(c)(4)(B), in the next section, I will describe the test in more detail.[21]

## 2.

Chapter 13 cases presenting issues regarding the extension or imposition of the automatic stay under 11 U.S.C. §362(c)(3) or (c)(4) almost always involve debtors who, like the Debtor in the Present Case, seek bankruptcy relief because their home mortgage is in default and they are facing foreclosure proceedings.  The foreclosure proceedings may have only just commenced

---

[21]      If, as suggested in the text, the differences between the Whitaker and Montoya approaches are relatively narrow, why debate the issue?  The answer is that the court's analysis of the evidence may differ materially depending upon which of the two approaches the court takes.  A court following Whitaker will require that the debtor prove certain specific facts.  In particular, borrowing the standard from §362(c)(4)(D)(i)(III), the court will likely require the debtor to prove (usually by "clear and convincing evidence") that there was a change in circumstances since the dismissal of the prior case and that the current case will result in the confirmation of a chapter 13 plan that will be fully performed.  A court following Montoya will require that the debtor prove by the requisite standard only one ultimate fact: that the case was filed in "good faith" as to the creditors being stayed, based on the more flexible totality of the circumstances standard.  As discussed in Part IVA.2, infra, the totality of the circumstances test may require only clear and convincing proof that the current case has a reasonable likelihood of success.

prior to the bankruptcy filing or they may have reached the point where a sheriff's sale of the

debtor's home is imminent.  Either way, the bankruptcy filing is perceived by many debtors as

the only way that they can save their home from foreclosure.  How is a court to measure the good

faith of a debtor who has not been successful in one or more previous attempts to achieve

financial rehabilitation through the bankruptcy process?

There are no appellate decisions in this Circuit analyzing the good faith standard under

§362(c)(3) and (4).  In the context of a motion to dismiss a chapter 13 case, filed under 11 U.S.C.

§ 1307(c), the Court of Appeals has directed the lower courts to examine "good faith"

case-by-case, based on the  "totality of the circumstances," including consideration of the

following:

- the nature of the debts involved;

- the timing of the petition;

- how the debt arose;

- the debtor's motive in filing the petition;

- how the debtor's actions affected creditors;

- the debtor's treatment of creditors both before and after the petition was filed; and

- whether the debtor has been forthcoming with the bankruptcy court and the creditors.

In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996).

At first blush, the Lilley standards, derived from a case involving a very different factual

matrix,[22] do not appear especially germane in a bankruptcy motivated by prevention of a home foreclosure.  Perhaps not surprisingly, in making good faith determinations under §362(c)(3) and (c)(4), courts in other jurisdictions have considered factors similar to those identified in Lilley and have supplemented them with factors derived from another provision of chapter 13 that references the debtor's good faith: §1325(a)(3).[23]  The courts have devised various "checklists" of good faith factors.  By my count, there are now at least fourteen (14), sometimes overlapping, factors identified by different courts as relevant in the consideration of good faith under §362(c)(3) and (c)(4), including:

1.    the timing of the filing of the petition;

2.    whether the debtor truly intends to effectuate a financial rehabilitation;

3.    whether the debtor made "eve of bankruptcy" purchases;

4.    the accuracy of the information provided by the debtor;

5.    the types of debts sought to be discharged and the circumstances in which they arose (e.g., is the debtor attempting to protect necessities such as a primary residence or luxuries, such as boat or vacation home);

6.    whether the plan is preferential as to certain creditors;

7.    in general, the debtor's treatment of creditors both before and after the

---

[22]    Lilley involved a debtor who had willfully and fraudulently evaded paying income taxes prior to the bankruptcy filing.  The Court of Appeals held that although the examples of "cause" for dismissal of a chapter 13 case explicitly set forth in 11 U.S.C. §1307(c) did not include lack of good faith in filing the petition, such a lack of good faith constitutes cause for dismissal under that section of the Code.

[23]    Section 1325(a)(3) provides that one of the conditions that must be met before a court shall confirm a chapter 13 plan is that the debtor's plan be proposed in good faith.  As a result of BAPCPA, it is now explicit in the statute that good faith in filing the petition is a condition that a debtor must satisfy to be entitled to confirm a chapter 13 plan.  See 11 U.S.C. §1325(a)(7).

petition was filed;

8.      whether the debtor seeks unfairly to manipulate provisions of the Code;

9.      the debtor's conduct in the prior case(s) (e.g., performance of the debtor's duties such as the filing of schedules and attendance at the meeting of creditors);

10.     the frequency with which debtor has sought bankruptcy relief;

11.     the reasons for the dismissal of the debtor's prior case(s);

12.     the debtor's earning capacity and likelihood that the debtor will have a steady income throughout the bankruptcy case;

13.     the likelihood that the debtor will be able to properly fund a plan; and

14.     whether the Trustee or creditors object to the debtor's motion.

See, e.g., In re Levens, 2007 WL 609844, at *4 (Bankr. W.D. Mo. Feb. 23, 2007) In re Hurt, 369 B.R. at 279-80; In re Elliott-Cook, 357 B.R. at 814 -815; In re Carr, 344 B.R. 776, 781-82 (Bankr. N.D. W.Va. 2006);  In re Baldassaro, 338 B.R. 178, 188 (Bankr. D.N.H. 2006); In re Havner, 336 B.R. 98, 103 (Bankr. M.D.N.C. 2006); In re Charles, 334 B.R. at 220-23; In re Montoya, 333 B.R. at 457-58.

A test that may involve consideration of as many as fourteen (14) factors, while relatively comprehensive,[24] is cumbersome.[25] Further, as one court has observed, judicial use of "'laundry

---

[24]     As a cautionary note, any conceivable list of factors in a totality of the circumstances inquiry cannot be exhaustive.  In re SB Properties, Inc., 185 B.R. 198, 205 (E.D. Pa. 1995) (citing Carolin Corp. v. Miller, 886 F.2d 693, 701 (4th Cir.1989)).

[25]     A more concise and perhaps more focused formulation of the totality of the circumstances inquiry in cases under §362(c)(3) or (c)(4) was set forth in In re Sarafoglou, 345 B.R. 19 (Bankr. D. Mass. 2006).  In Sarafoglou, the court stated that the debtor's burden in proving that the case has been filed in good faith is to establish, by clear and convincing evidence, that he or she:

lists,'" creates a risk that a court will "engage in mere 'indicia-counting,' or [may] 'force particular facts into previously identified patterns.'"  In re SB Properties, Inc., 185 B.R. at 205 n.5 (citing Carolin Corp. v. Miller, 886 F.2d 693, 701 (4th Cir. 1989)).  Consequently, when presented with a lengthy "checklist" of factors available to assist a court in making a discretionary decision, it is helpful, if possible, to develop a more focused analytic framework.

As amplified below, in making use of the factors from the "checklists" developed by the courts in ruling on a §362(c)(4)(B) motion, I find it helpful to consider a debtor's good faith in both subjective and objective terms.  Accord In re Winters, 2006 WL 3392890, at *3 (Bankr. W.D. Va. Nov. 22, 2006); In re Mark, 336 B.R. 260, 268 (Bankr. D. Md. 2006);  In re Charles, 334 B.R. at 218.

After one or more prior chapter 13 cases have failed to achieve the debtor's financial rehabilitation goal, a debtor who files yet again, whether driven by self-deception or emotional desperation, may sincerely (i.e., subjectively) intend to implement a chapter 13 plan.[26]  In that sense, the debtor may be acting in good faith.  Objectively, however, the proposed chapter 13 plan may have little chance of success.  Not surprisingly, courts have recognized that good faith in a bankruptcy rehabilitation case necessarily includes both subjective and objective

---

- • filed the case "to obtain legitimate bankruptcy law protection;"
- • "is eligible for such protection and relief;"
- •  "is pursuing such protection and relief honestly'" and
- • " has sufficient resources to render her pursuit thereof meaningful."

Id. at 24.

[26]  Debtors who sincerely intend to attempt to implement a financial rehabilitation plan should be distinguished from debtors who file a bankruptcy case merely to "stay and delay" an inevitable foreclosure.  See Charles, 334 B.R. at 219.

components. This dichotomy has been explained in the chapter 11 context as follows:

> The objective futility inquiry focuses on whether "there is no going concern to preserve . . . and . . . no hope of rehabilitation, except according to the debtor's 'terminal euphoria.' " Carolin Corp., 886 F.2d at 701-02. The subjective bad faith inquiry concentrates on whether petitioner's "real motivation is 'to abuse the reorganization process' and 'to cause hardship or to delay creditors by resort to the Chapter 11 device.' " Id. at 702.

In re SB Properties, Inc., 185 B.R. at 204 n.4; accord Charles, 334 B.R. at 218 (citing In re

Elmwood Dev. Co., 964 F.2d 508, 512 (5th Cir.1992); see also In re SGL Carbon Corp., 200

F.3d 154, 165 (3d Cir. 1999) (debtor's subjective intent is not determinative of good faith of

bankruptcy filing).

Courts have also observed that there is an overlap between the subjective and objective

components of good faith:

> Good faith involves, to some extent, the motives of the debtor and so contains a subjective dimension. Obviously, though, there is an overlap to the objective and subjective components. The more objectively clear it is that a debtor cannot reorganize, it is concomitantly more difficult to conclude that the debtor's subjective belief in its ability to reorganize is in good faith.

In re Roxy Real Estate Co., 170 B.R. 571, 573 (Bankr. E.D. Pa. 1993) (per Fox, J.); accord SB

Properties, 185 B.R. at 205.

The numerous factors employed by courts in the "totality of the circumstances" inquiry

are consonant with the subjective/objective dichotomy described above.[27]

In the end, whatever factors are analyzed, the court's decision boils down to a

determination of the debtor's subjective and objective good faith.  As the court observed in In re

---

[27]    The first ten (10) of the "good faith factors" listed above, particularly factors #1 and #2, when applicable, generally relate to the debtor's subjective good faith in filing, while factors #10 through #14 relate more closely to the debtor's objective good faith.  Factor #9 is relevant in both senses of "good faith."

<u>Charles</u>, in construing §362(c)(3):

> if the newly filed case is futile or if the debtor is filing merely to benefit from the "stay and delay," the Court must recognize this at the earliest possible time. In adopting § 362(c)(3), Congress intended the Court to conduct an early triage of a case . . . .  Absent exceptional circumstances, a debtor fails to sustain her burden of demonstrating good faith as to the creditors to be stayed if the case lacks a reasonable likelihood of success.

334 B.R. at 219. The same principles apply under §362(c)(4).

Thus, in evaluating good faith under §362(c)(4) in terms of the debtor's subjective and objective good faith, I consider the various checklists developed by the courts to be a resource I can draw upon to shape my analysis of a particular debtor's good faith. In doing so, I do not consider it necessary to evaluate each and every factor that has been considered by a court in a reported decision.  Rather, I may refer to the checklists as a guide, permitting me to consider those factors that are most relevant in the circumstances of the particular case at hand.[28]

With these principles in mind, I consider the facts of this case.

## B.  The Present Case Was Filed In Good Faith

It is indisputable that the Debtor had two (2) or more cases pending when the Present Case was filed.  Consequently, the Debtor must rebut a presumption that the Present Case was filed "not in good faith," and must establish, by clear and convincing evidence, that the Present

---

[28]    I have previously observed that use of a "totality of the circumstances" test as the explanation for a judicial decision amounts to "not so much pronouncing the law in the normal sense as engaging in the less exalted function of fact finding."  <u>In re Glunk</u>, 342 B.R. 717, 732 (Bankr. E.D. Pa. 2006) (quoting Antonin Scalia, <u>The Rule of Law As a Law of Rules</u>, 56 U. Chi. L. Rev. 1175, 1180-81 (1989)).

Case was filed in good faith as to the creditors to be stayed.  11 U.S.C. §362(c)(4)(B), (D).  In

this case, the only creditor contesting the imposition of the stay is WMB.  Upon consideration of

the facts presented, I find by clear and convincing evidence that the Debtor filed the Present Case

in good faith as to WMB.


## 1.

Consideration of the Debtor's performance in the First Case, her efforts to improve her

financial situation in connection with the Present Case and the absence of evidence of any of the

factors tending to suggest bad faith (e.g., dishonest schedules, preferential treatment of creditors

or some other manipulation of the provisions of the Bankruptcy Code) lead me to conclude,

without hesitation, that the Debtor filed the Present Case in subjective good faith.

In the First Case, the Debtor made a serious, albeit ultimately unsuccessful, effort to cure

her mortgage delinquency.  Early in the case, she missed some postpetition monthly mortgage

installments that fell due to WMB, causing WMB to file a motion for relief from the automatic

stay under 11 U.S.C. §362(d).  After that motion was settled, she was able to make consistent

monthly mortgage payments to WMB for a period of time.

As for the chapter 13 plan the Debtor filed in the First Case, the Debtor obtained

confirmation of the plan within ten (10) months of the First Case, a length of time that strikes me

as only slightly longer than is typical of those chapter 13 cases that achieve confirmed status in

this district.  Prior to dismissal, the Debtor made a substantial effort to comply with plan

obligations.  In the twenty-two (22) months between July 2005 and April 2007, the Debtor made

payments approximating 20 plan payments.  The payments were made on a relatively regular

basis: the payments were sent in 18 different months, there being two (2) months in which the

Debtor sent the Trustee a "double payment."[29]  Her payments to the Trustee totaled $7,908.00 of

the approximately $26,500 base amount of her Confirmed Plan and close to ninety percent (90%)

of the amount of the plan payments that had fallen due.

While the connection between the Debtor's illness and income reduction in early 2007

and the dismissal of the First Case is not readily apparent to me,[30] the profile that nonetheless

emerges from a review of the Debtor's conduct and performance in the First Case and her

conduct since its dismissal is of a debtor who is motivated to fulfill her obligations as a

bankruptcy debtor and who has made and can be expected to continue to make a sincere effort to

fulfill those obligations responsibly.  While she did not fully perform all of her obligations under

the Confirmed Plan in the First Case, she was successful in substantially meeting her obligations

in a relatively consistent fashion for a significant period of time.  As a result of her efforts,

---

[29]     In these calculations, I have included the payment posted by the Trustee on May 2,
2007, eight (8) days after the case was dismissed, as that payment was received while the
Debtor's April 2007 plan payment was due and before the May 2007 payment fell due.

[30]     My review of the Debtor's payment history, see Exhibit W-6, suggests the
Debtor's delinquency resulted from one missed monthly payment that was not cured by a
subsequent "double payment" combined with her delay in increasing her plan payment, as
required by the Confirmed Plan, from $376.00 per month to $430.00 per month. She was already
delinquent in her plan payments when she fell ill in December 2006.  Thus, I am not persuaded
that the illness that caused her to miss work in late 2006 through early 2007 was the root cause of
the dismissal of the First Case.  Since the demise of the First Case appears to have been caused,
at least in large part, by a shortfall in the level of the chapter 13 payment over an extended period
of time, the key question now is whether the Debtor has sufficient income and resources to
establish that the Present Case has a reasonable likelihood of success. This is discussed in Part
IV.B.2, infra.

Debtor succeeded in improving WMB's position over the course of the First Case.[31]  Further,

since the dismissal of the First Case, the Debtor has made a concrete effort to improve her

financial situation.  She made a diligent effort to increase her overtime pay in her primary place

of employment and has taken a second, part-time job in order to further increase her income.

This history convinces me that the Debtor is sincere in her desire to employ the

Bankruptcy Code for its intended rehabilitative purpose.

## 2.

As for the Debtor's objective good faith, I find, by the requisite standard of proof, that the

Debtor's income is adequate to provide the Present Case with a reasonable likelihood of success

and that the case was filed in objective good faith.

As acknowledged by WMB's attorney at the close of the hearing, "on paper" (i.e., a

comparison of the Debtor's projected income set forth in Amended Schedule I and her projected

expenses set forth in Amended Schedule J) the Debtor can adequately fund a chapter 13 plan

designed to cure her prepetition mortgage delinquency.  Her income exceeds her expenses by

$570.00 per month and her proposed plan payment is $510.00.[32]  Not surprisingly then, WMB

vigorously contested the Debtor's income and expense projections.  At the hearing, the Debtor

---

[31]      At the end of the First Case, the Debtor had paid the postpetition installments
falling due on the WMB mortgage and, through her plan payments, had reduced the prepetition
delinquency on the mortgage from $9,013.84 to $6,806.46.  See Exhibit W-6.

[32]      At the hearing, WMB's attorney argued that the Debtor's plan is underfunded and
estimated that in order to fully pay WMB's claim for prepetition mortgage arrears, the Plan
would have to be $530.00-540.00 per month.  Even if that estimate is correct, the Debtor's
projected income would be adequate to fund the plan.

testified extensively and was cross-examined closely regarding the level of income that she can

expect to receive reliably and the level of her expenses.  As the factfinder, however, I am

satisfied that the Debtor's income and expense projections are realistic.  See Finding of Fact Nos.

38-41 & nn.16-17, supra.

Any concerns that I may have regarding the probability that the Debtor will be able to

perform her plan obligations in the Present Case derive from the problems in the First Case.  In

the First Case, the Debtor was able to pay the Trustee $375.00 per month consistently, but she

did not timely increase plan payments from $375.00 per month to $430.00 per month as required

by the Confirmed Plan.  See n.30, supra.  In the Present Case, the Debtor will likely be required

to make an even higher plan payment, $510.00 per month (or perhaps $530.00 or $540.00 per

month, as WMB contends).  I have found as a fact, however, that the Debtor has increased her

income sufficiently since the conclusion of the First Case to provide for the increased plan

payment.[33]  I find further support for my conclusion in the Debtor's stable work history (in which

she has worked for the same employer for the last five (5) years) and her demonstrated

motivation to make every effort to generate enough income for her plan to succeed.

In short, I am convinced, based on the Debtor's financial situation, that her proposed plan

has an objective, reasonable probability of success, further contributing to my conclusion that she

filed the Present Case in good faith as to WMB.

---

[33]     I am aware that some of the cushion in the Debtor's income and expense
statement is consumed by increased travel expenses.  See n.17, supra.  However, the Debtor can
address any potential problem either through careful management of her expenses or increasing
her hours slightly on one of her two jobs.

### C. <u>WMB's Legal Arguments</u>

WMB makes two (2) legal arguments which, if accepted, would trump the findings and conclusions set forth above.  These arguments are that: (1) the Debtor has no legal entitlement to the imposition of a bankruptcy stay because there was no change in the Debtor's circumstances between the filing of the Second Case and the Present Case; and (2) the Present Case was not filed in good faith as to WMB because the Debtor's plan is patently unconfirmable on its face. For the reasons explained below, I am not persuaded by these arguments.

### 1.

The Debtor filed two cases prior to the Present Case.  The First Case lasted from June 2005 through April 2007. The Second Case lasted only seventeen (17) days, having been dismissed due to the Debtor's counsel's failure to properly advise her regarding the §109(h) credit counseling eligibility requirement.

WMB argues that the dismissal of the Second Case mandates denial of the Motion. Drawing from one of the statutory standards that determine whether the rebuttable presumption arises that a case was filed "not in good faith," WMB contends that the Debtor must prove that she had: (a) a "substantial change"'; (b) in her "financial or personal affairs;" (c) "since the dismissal of <u>the next most previous case</u>."  11 U.S.C. §362(c)(4)(D)(i)(III) (emphasis added). WMB posits that even if there was a change in circumstances between the First Case and the Second Case, there was no such change during the eleven (11) days between the dismissal of the Second Case and the filing of the Present Case.

This argument, while facile, is not persuasive for two reasons.

-29-

First, I have concluded that §362(c)(4)(D) establishes the standards for determining whether a rebuttable presumption arises that a case has been filed "not in good faith."  It is not the subsection of §362(c)(4) that governs whether a stay should be imposed.  Imposition of a stay is determined under §362(c)(4)(B) and the decision whether to impose the stay is based upon a consideration of the totality of the circumstances.  See Part IV.A.1, supra.

Indeed, the facts of this case illustrate why the good faith determination should neither depend on any one factor nor be made based on an inflexible application of the standards for determining whether the "rebuttable presumption" arises.  The Second Case was extremely short-lived due to procedural inadequacies for which the Debtor was not culpable (i.e., her counsel's failure to advise her of the necessity to obtain prepetition credit counseling).  The Debtor refiled promptly after the dismissal of the Second Case.  The circumstances surrounding the dismissal of the Second Case in no way imply that the next filed case was in bad faith; the circumstances suggest only that the Present Case was filed to accomplish what the Debtor set out to do by filing the Second Case.

Even if the text of §362(c)(4)(D)(i)(III) were determinative on the issue, one need only look further in §362(c)(4)(D)(i)(III) to find an expression of Congress' intent to give some discretion to the bankruptcy court in evaluation the circumstances.  Section 362(c)(4)(D)(i)(III) expressly provides that even if there was no "substantial change in . . . financial or personal affairs . . .  since the dismissal of the next most previous case," the rebuttable presumption does not arise if there is "any other reason to conclude" that the current case will be concluded successfully.  For purposes of evaluating the Debtor's good faith in filing the Present Case, I consider the circumstances surrounding the dismissal of the Second Case to be the type of "other

reason" that overrides the strict application of the "change in circumstance/next most previous

case" test.

At bottom, in evaluating the Debtor's good faith in filing the Present Case, I consider the

Second Case to be of little significance.  See generally 11 U.S.C. §362(c)(4)(D)(i)(II) (if two (2)

cases were pending within one year before dismissal of a prior case for failure to file documents,

the presumption that current case was filed "not in good faith" arises even if failure was merely

inadvertent or negligent "unless the dismissal was caused by the negligence of the debtor's

attorney") (emphasis added).[34]


## 2.

WMB's second legal argument is that the Present Case was not filed in good faith as to

WMB because the Debtor's plan is patently unconfirmable.  It is unconfirmable, according to

WMB, because it provides for a cure of the prepetition delinquency in a sixty (60) month plan

and such a plan is not consistent with 11 U.S.C. §1322(b)(5).

Section 1322(b)(5) provides that a chapter 13 plan may "provide for the curing of any

default [of long-term debt] within a reasonable time and maintenance of payments while the case

is pending . . . ."  Id. (emphasis added).  WMB asserts that, in light of the Debtor's prior

bankruptcy (i.e., the First Case), which lasted close to two years, it is not reasonable to permit the

---

[34]    WMB also argues that, even if the Second Case is not considered, there was no change in circumstances at the time the Second Case was filed because the Debtor did not receive her first paycheck from her second employer until after the Present Case was filed.  This argument overlooks the fact that, at the time the Present Case was filed, the Debtor either had already started working part-time (and had not yet received her first paycheck) or, more likely than not, was at least aware that the part-time job was available to her.  Either way, there was a change in circumstances.

Debtor another sixty (60) months in which to cure the delinquency.  WMB depicts the Present

Case as part of a <u>de facto</u> seven (7) year chapter 13 rehabilitation plan, which cannot be

confirmed because its term exceeds that authorized by §1322(b)(5).   If, as WMB contends, a

plan of a shorter duration is mandated, the Debtor lacks the resources to fund such a plan,

rendering the Present Case futile and therefore, not in good faith as to WMB.

     The concern raised by WMB is not frivolous.  Consideration of the amount of time that

has passed while a debtor has attempted to cure a default in one or more prior bankruptcy cases is

relevant in evaluating whether the time proposed for a cure in a current case is reasonable.

Undoubtedly, there are cases in which the prior history may make it patently unreasonable to

permit a debtor another sixty (60) months to cure a default.  The decision is a discretionary

determination, however.[35]  There is no fixed legal principle requiring that "the prior case time" be

---

[35] Even at the confirmation stage of the case, bankruptcy courts have long emphasized
that "a bankruptcy court exercises its discretion in light of each case's unique facts to determine
whether a given plan's cure terms are 'reasonable' within § 1322(b)(5)'s meaning."  <u>In re Hence</u>,
358 B.R. 294, 303 (Bankr. S.D.Tex. 2006) (quoting <u>In re Sidelinger</u>, 175 B.R. 115, 119 (Bankr.
D. Me. 1994)); <u>accord</u> <u>Matter of Herrera</u>, 1991 WL 7704 (D.P.R. Jan. 15, 1991).   Courts have
considered a variety of factors in evaluating whether the length of time for the debtor's proposed
cure is "reasonable," including:

    1.  the Debtor's payment record;

    2.  the amount of the default;

    3.  the reason for incurring in the arrears;

    4.  the time over which the default has accrued compared to the time within
       which it is to be cured;

    5.  the nature of the property held as security for repayment of the debt;

    6.  the necessity of the asset to an effective rehabilitation of the debtor;

-32-

subtracted automatically from the potential sixty (60) month term for curing the default in the current case.[36]

   Thus, I decline WMB's invitation to adopt a mechanistic rule for evaluating the length of time that will be considered "reasonable" for curing a residential mortgage default under 11 U.S.C. §1322(b)(5) in the context of deciding a §362(c)(4)(B) motion.  Nor do I agree that this is a case in which it is obvious from the outset that a sixty (60) month plan cannot be confirmed. The Debtor made some progress in curing the default on the WMB mortgage in her prior case and at this early stage of the case, I am unwilling to find that her proposed cure of the mortgage delinquency over the sixty (60) month term of her proposed plan is unreasonable under 11 U.S.C. §1322(b)(5) as a matter of law.  The issue whether her proposed sixty (60) month plan passes muster under §1322(b)(5) is better left for plenary consideration at the confirmation hearing.  In

───────────────

7.   the effect of the length of the repayment period on the actual obligation;

8.   the ability of the debtors to meet the obligations of their plan and to continue current payments on their installment obligations;

9.   whether Debtor is exerting his or her best efforts to cure the arrears.

Matter of Herrera, 1991 WL 7704, at *1; In re Chavez, 117 B.R. 730, 732 (Bankr. S.D. Fla.1990);  In re Wiggins, 21 B.R. 532, 534 (Bankr. D.S.C. 1982) (citing In re Pollasky, 7 B.R. 770 (Bankr. D. Colo. 1980));  In re King, 7 B.R. 110, 112 ((Bankr. S.D. Cal 1980); aff'd, 23 B.R. 779 (9th Cir. B.A.P 1982).


   [36] Many courts have held that a cure that takes place over the length of the entire plan can be "reasonable" under §1322(b)(5).  In re Chavez, 117 B.R. at 732;  In re Randolph, 102 B.R. 902, 903-04 (Bankr. S.D. Ga. 1989); In re Harmon, 72 B.R. 458, 462 (Bankr. E.D. Pa. 1987). But see In re Newton, 161 B.R. 207 (Bankr. D. Minn. 1993) (adopting a presumption that twelve (12) months is a reasonable period for chapter 13 cure of a residential mortgage default).  To resolve the matter before me, I need not define the parameters of the term "reasonable time to cure" as it is used in §1322(b)(5).

the meantime, WMB's rights remain protected by the Debtor's obligation to make postpetition

monthly installment payments and WMB's ability to obtain relief from the automatic stay under

11 U.S.C. §362(d) in the event of a default or any other reason which may cause WMB's secured

interest to lack adequate protection.


# V.  <u>CONCLUSION</u>

For the reasons set forth above, an order will be entered granting the Motion and

extending the automatic stay as to the Debtor's creditors.


**Date:**   <u>October 19, 2007</u>        _____

                                                       **ERIC L. FRANK**
                                                       **U.S. BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| IN RE: | SHAWNNAT N. FERGUSON | : | Chapter 13 |
| | | : | |
| | **Debtor** | : | Bky. No. 07-14559ELF |

# O R D E R

**AND NOW**, upon consideration of the Debtor's Motion to Impose the Automatic Stay

("the Motion"), the opposition of Washington Mutual Bank, and after a hearing, and for the

reasons set forth in the accompanying Opinion, it is hereby **ORDERED** that:

1. The Motion is **GRANTED**.

2. A stay identical to the scope of the automatic stay provided in 11 U.S.C. §362(a) is imposed

   on all creditors who were served with the Motion or Notice of the Motion ("the §362(c)(4)

   Stay").

3. The §362(c)(4) Stay shall remain in effect unless modified by the court in accordance with 11

   U.S.C. §362(d) and Fed. R. Bankr. P. 4001(a).

4. This Order is effective immediately upon its entry on the docket.  See 11 U.S.C

   §362(c)(4)(C).

Date:   October 19, 2007                                  _____

                                                         **ERIC L. FRANK**
                                                         **U.S. BANKRUPTCY JUDGE**

**Counsel**

Michael Kutzer                                           Leroy C. Etheridge
Attorney for the Debtor                                  Attorney for William C. Miller, Trustee

Andrew L. Spivack
Attorney for Washington Mutual Bank